The CITY OF SAND SPRINGS, a Municipal Corporation, Sand Springs Chamber of Commerce, a corporation, and Clark Walton, Louise W. Rowe, William D.

Bigby, Charles P. Garner, Jr., John W. Boyer, Ron E. Limscler, W. J. Filleright, Mrs. W. J. Filleright, Terry L. Jones, Mrs. Terry L. Jones, Patty Benton, Kenneth R. Whitmore, J. N. Powers, Mrs. J. N. Powers, Docker Kosier, Mrs. Docker Kosier, Mrs. Kathleen Foote, H. E. Hardage, Billy D. Hardage, John D. Hardage, Caroline Purser, Bertha De-Cou, Bessie Lusk, Grace R. Baker, Billie Bloss, Anna Mae Austin, Katheryn Brooks, Geneva Garoughty, David O. Snyder, C. L. Purser, Ralph Hall, Roger Snodgrass, Peggy Harrison, Jerry R. Claybrook, Rudy L. Vaughn, Carl Rider, Donald Dohlman, David L. Davis, Don Wilson, Bob McFall, James W. Russell, Jack Earls, Al Standrige, M. D. Lay, Anna Harris, William J. Brown, Steven Peters, Kenneth D. Hice, Ron Dobbs, David F. Lundy, Stanley D. Breedlove, D. Edward Hurst, Jack L. Hill, Richard L. Steinberg, Lloyd L. Patterson, Pat Crosier, Orvis Cromson, Michael E. Thompson, Vicki Dustin, Dewey Turney, Doris Allen, Janet L. Wallace, John W. Patterson, Leo G. Vaughn, Jesse M. Rowe, Jim Jackson, L. B. Ellison, Lanny Childress, J. R. Hoggatt, C. E. Browers, Carolyn Byford, Marcia Youngblood, Patricia A. Wattenbarger, Glenda P. Grayson, Margie McClanahan, Harlan S. Pinkerton, Jr., Opal Bigby, Clarence O. Bigby, Walter Rick Grubb, Ron Hufford, Allen Erwin, Larry W. McBride, Dr. James W. Reed, Paula Thurmond, Terry Jones, J. D. England, Anita Steeher, Joe Ganem, Monte R. Box, Kenneth L. Tisher, Individuals, Appellants,

v.

The DEPARTMENT OF PUBLIC WELFARE, State of Oklahoma, and Lloyd E. Rader, Appellees.

No. 53768.

Supreme Court of Oklahoma.

March 11, 1980.

As Corrected March 19, 1980.

C. B. Savage, Stephen R. McNamara, Morehead, Savage, O'Donnell, McNulty & Cleverdon, Tulsa, Erwin D. Phillips, Sand Springs, for appellants.

Thomas H. Tucker, Oklahoma City, for appellees.

HARGRAVE, Justice.

The people of the State of Oklahoma, by referendum vote in 1936, established the Department of Public Welfare, giving it powers such that the usual rules of the doctrine of separation of powers do not obtain to restrict the activities challenged here. The people have spoken; the Constitution, as the organic law of the State, will be obeyed. The provisions of Article XXV of the Oklahoma Constitution render inapplicable the persuasively presented, and usually obtaining, doctrine of separation of governmental powers. Thus the outer limits of the authority of the Department must be measured by the unique provisions of the Oklahoma Constitution, and that measurement dictates the conclusions made herein.

This action was brought by the city of Sand Springs, the Chamber of Commerce of the city of Sand Springs, and numerous other plaintiffs as listed above, seeking to enjoin the construction of a detention facility for "prepsychopathic and presociopathic" juveniles at the present site of the Rader Diagnostic Center in Sand Springs. The petition generating this action alleges the institutional facility constitutes a threat to the health, safety and welfare of plaintiffs, and as such, poses the spectre of a continuing nuisance. The Sand Springs police department is presently overburdened by juvenile escapes, which numbered 150 during the calendar year of 1978, placing an undue burden upon law enforcement in the area. The increase of this problem is alleged to constitute a threat to citizens in the surrounding area. The petition also alleges the grant of the property on which this institution is built is a determinable fee conditioned upon the use of the premises as a "site for the construction and maintenance of a school and hospital for mentally retarded children." The Board of Regents has executed a waiver and consent authorizing the construction of a juvenile diagnostic and evaluation center, and the petition alleges the proposed construction is outside the scope of the limited fee granted and the waiver subsequently given.

The material portion of the petition as presented upon appeal alleges the construction of the facility is an improper use of funds collected under authority of the Oklahoma Sales Tax Code, 68 O.S.1971 § 1301, et seq., by virtue of the fact that there is no provision in the law allowing use of such funds for construction of a detention center for incorrigible delinquent minors. The posture of this action at trial presented the theory that the proposed facility constituted a nuisance. This theory has been abandoned on appeal, as the transcript clearly demonstrates the secure facility is designed to alleviate current conditions constituting a nuisance. Additionally, the petition alleges construction of the facility with funds provided by the Sales Tax Code constitutes a violation of the Constitution of the State of Oklahoma, Article X § 19 because the tax collected for purposes specified by the Legislature is being devoted to a purpose not specified. Article X § 19 states:

Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose.

The defendant demurred specially to the count in the petition relating to the use of property at the site of Hissom Memorial Center for purposes other than those allowed in the limited estate granted by the Board of Regents on the ground that the face of the petition disclosed the plaintiff lacked standing to enforce compliance with the determining limitation found in the grant, citing *Nelson v. Garrett, 201 Okl. 9, 200 P.2d 420 (1948)*. This demurrer was sustained and no appeal has been saved therefrom by the petition in error.

In their trial brief, the appellants contend that the establishment of a maximum security structure to house incorrigible juveniles is a rule-making function establishing a fourth class of juveniles under the care of the Department other than the statutorily recognized classes of dependent and neglected, in need of supervision, or delinquent; adding to the last classification incorrigible delinquent. Establishing such a class is asserted to be a rule-making function which can be accomplished validly under the Administrative Procedures Act only by publication of notice and during a legislative session. Appellants, as a basis for such proposition, contend that despite the exception of the Commission generally, 75 O.S.1971 § 301(1)(c) from the Administrative Procedures Act, that agency is required to follow the act's rule-making regulations under the express provisions of § 301(1)(c), applying § 304 of the act to the Department.

Appellants propose that the establishment of a new facility for incarceration of "problem delinquents" by the Department of Public Welfare is an usurpation of legislative authority reserved unto the Legislature and the people of the State of Oklahoma by virtue of Article V, Section 1 of the Oklahoma Constitution.[1] As stated in the Department's brief: "the Commission is authorized to utilize any institution under its jurisdiction for any program the Commission or Department administers, 56 O.S. § 333, and it is further authorized to make capital expenditures at these institutions 'whenever the Commission finds the same is needed for the proper discharge of its responsibilities.' 56 O.S. § 305." Appellants' position basically is that such a statement on its face bears out their contention that the Department has here assumed legislative powers far beyond those properly delegable. Title 56 O.S.1971 § 305 bears the title:

Rules and regulations—Repair of buildings—Federal funds—Superintendents and other personnel—Expenditure of funds.

Subsection (c) provides:

The Commission may provide for the repair, alterations, or remodeling of any existing building at the above-named institutions, or at any other institution under its jurisdiction, necessary for the proper and efficient administration and to conserve the properties and the State's investment in such properties. Funds available for operating expenses and revolving funds of institutions under the control of the Commission may be used for such purposes, and may also be expended for land and other capital outlay, whenever the Commission finds the same is needed for the proper discharge of its responsibilities. . . .

■ This Court has previously equated the term "capital expenditure" with "capital outlay." *Osage County Excise Board v. Missouri-Kansas-Texas R. Co., 340 P.2d 217 (Okl.1959)*. The language of the statute, foreshadowed by the title of the section, clearly authorizes the Commission to construct a capital improvement whenever the Commission finds the improvement necessary for the discharge of its responsibilities imposed by statute. While it is "well settled" in this jurisdiction that the power to determine the policy of the law is primarily legislative and cannot be delegated, the power to make rules of a subordinate character in order to carry out the policy legislatively determined and to apply that policy to varying factual conditions, although sharing the attributes of legislative exercise of power, is in its major sense an administrative duty which may be delegated properly to an administrative body by the Legislature. *State ex rel. Hart v. Parham, 412 P.2d 142, (Okl.1966); Associated Industries v. Industrial Welfare Commission, 185 Okl. 177, 90 P.2d 899 (1939)*. Otherwise stated,

1. Article V, Sec. 1. The legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.

the Legislature may delegate to an administrative body the power to determine some fact or state of facts upon which the law makes its operation depend. *Isaacs v. Oklahoma City, 437 P.2d 229 (Okl.1967); Harris v. State ex rel. Oklahoma Planning & Resources Board, .207 Okl. 589, 251 P.2d 799 (1952). The Commission is statutorily authorized to determine if the questioned capital outlay is needed for the discharge of the Commission's statutory duties, and to act upon that determination by the expenditure of the stated funds.*

▮▮▮ Finding the Commission has been legislatively authorized to carry out the act here challenged, the more fundamental question is: can such a broad grant of power be justified under the separation of powers made in Oklahoma state government by the ultimate authority of its Constitution in Article IV § 1, or is such a decisional power a nondelegable legislative function?

The Department of Public Welfare is a Constitutional body created by Section 2 of Article XXV of the Oklahoma Constitution enacted through the vote of the citizens of the State on July 7, 1936. Section 2 clearly gives the administrative body not only the authority to execute the laws enacted pursuant to Article XXV, § 1 duties, but also empowers the Department, as well as requiring it, to "perform such other duties as may, from time to time, be prescribed by law:"

> For the purpose of effectively administering and carrying into execution all laws enacted pursuant to the authority granted in Section One hereof, there is hereby created a Department of Public Welfare. Said Department of Public Welfare is hereby charged with the duty and responsibility of faithfully administering and carrying into execution all laws enacted pursuant to the authority granted in Section One hereof and shall perform such other duties as may, from time to time, be prescribed by law.

The specific duties Section 2 requires the Department to carry out are set forth in Section 1 of Article XXV, which was adopted by affirmative vote of the citizenry of this State contemporaneously with Section 2. Section 1 states:

> In order to promote the general welfare of the people of the State of Oklahoma and for their protection, security and benefit, the Legislature and the people by initiative petition are hereby authorized to provide by appropriate legislation for the relief and care of needy aged persons who are unable to provide for themselves, and other needy persons who, on account of immature age, physical infirmity, disability, or other cause, are unable to provide or care for themselves; . . .

Among others, this section empowers the Legislature to enact legislation for the relief and care of ". . . other needy persons . . . who are unable to provide or care for themselves." To conclude that the Legislature constitutionally assigned the authority to enact legislation for the benefit, care and relief of persons of immature age who are unable to provide or care for themselves is inescapable. Additionally, the second section of Article XXV of the Oklahoma Constitution clearly gives the Department the authority to administer all laws enacted pursuant not only to those powers found in Section 1, but also other duties which are from time to time assigned to that Department by legislative enactment. Under such a broad constitutional mandate, it might be concluded that the Department is constitutionally required to perform those duties assigned to it from time to time and those duties are not restricted to the purposes set forth verbatim in Section 1, but are only constitutionally limited to those which are germane to the ". . . promote[ion of] the general welfare of the people of the State of Oklahoma and for their protection, security and benefit" as noted in the first portion of Section 1. However, here we need not determine the precise outer limits of the Legislature's power to assign additional duties, because it is clearly inescapable that the duty assigned here comes within the ambit of Section 1 of Article XXV.

The very concept of delegation of legislative authority as being a violation of the doctrine of separation of powers is questionable in the setting involved here under Article IV, Section 1, since this provision does not create an absolute division of powers. It states:

*The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial, and except as provided in this Constitution, the Legislative, Executive and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others.* (Emphasis added.)

One of these exceptions is provided in the Constitution, found in Article XXV, Section 4, which states:

. . . . .

The Commission shall formulate the *policies* and adopt rules and regulations for the effective administration of the duties of the Department. . . .

This mandatory constitutional requirement that the Commission formulate policies for the effective administration of its duties is indicative of a constitutional mandate from the people to the Commission to legislate when necessary to accomplish effectively the duties imposed upon the body. This Court has committed itself to the proposition that the essence of the legislative function is the determination of policy; indeed, the dichotomy between administrative acts and legislative acts hinges upon the declaration of policy, which is a legislative function, and the implementation of that policy, which is traditionally an administrative function. See *Wells v. Childers, 196 Okl. 353, 165 P.2d 371 (1945), School District # 25 of Woods County v. Hodge, 199 Okl. 81, 183 P.2d 575 (1947), State ex rel. and Hart v. Parham, supra.* Under Article XXV, Section 4 of this State's Constitution, the only limitation upon the Commission's rule-making ability is that they be made in furtherance of the department's duties as provided by law.

We are therefore constrained to hold the people of the State of Oklahoma, by passing Article XXV §§ 2 and 4 at a Constitutional referendum vote, have removed the prohibition against delegation of legislative authority to the Welfare Department. The remaining criteria by which to measure the authority of the Commission to act is: Was the questioned action in furtherance of the Department's duties as provided in Oklahoma Constitution, Article XXV § 4: "The Commission shall formulate the policies, and adopt rules and regulations for the effective administration of the duties of the Department."? Was the decision to construct the institution done in furtherance of a duty placed upon the Department? 10 O.S.1975 Supp. §§ 601–606 nominate the Department as the State Planning and Co-ordinating Agency for statewide juvenile justice and delinquency prevention services. These eight statutes submerse the Department in the entire field of juvenile justice from intake to discharge from the juvenile justice system. But 10 O.S.1975 Supp. § 601 et seq. is not the genesis of the Department's intrusion into the justice system as it affects juveniles, for the responsibility of the Welfare Department over the field of juvenile incarceration was assigned by 10 O.S.1971 §§ 451–458 in 1961. Those statutes transferred the institutions located at Tecumseh, Boley, Helena and Taft from the Board of Managers to the Welfare Department. The institution for children located at Pryor, known as Whitaker State Children's Home, was added by 10 O.S.1971 § 1401 in 1968. In a similar statute found in Title 56 in Chapter 8, entitled "Transfer of Institutions," the Enid, Pauls Valley and Hissom Memorial were transferred to the Department from the Mental Health Board, 56 O.S.1971 § 301.

In the statutes pertinent to incarceration of juveniles, we find that under 10 O.S.1979 Supp. § 1116(a)(3), a court commitment of a delinquent child to the custody of the Department must be for an indeterminate time, and that phrase has been interpreted to mean the trial judge may thereafter not control the length of the Department's custody nor may he require the Department to

seek further directions from the court. *State ex rel. D. I. S. R. S. v. Jennings, 561 P.2d 99 (Okl.Cr.1977), In the Matter of D. W. S., 563 P.2d 663 (Okl.Cr.1977).* The latitude allowed the Department in determining to release delinquent children is narrowed 10 O.S.1977 Supp. § 1139 only by the Department's determination that there is a reasonable probability that retention of custody is no longer necessary for rehabilitation and treatment, or for the protection of the public. At other instances, the statutes require the Department to consider the safety of the public in placing or retaining custody. 10 O.S.1971 § 1135, and 10 O.S. 1971 § 1404(c).

The children's institutions under the care of the Department, as noted above, are not strictly function segregated inasmuch as the Department is authorized to transfer children from one class of facility to another class of facility under 10 O.S.Supp.1978 § 1137, et seq. The transfer provisions as noted above, and the statute providing a primary (and not single) purpose for named institutions, 10 O.S.Supp.1978, § 1402, allow the Department to deal with children as individuals, and appear to present the Department with authority to disregard formal labels attached to juveniles placed in its care so that the Department may attempt the usual task of providing the care, treatment and education suited to the *individual child's best interest.* Under these transfer provisions, the Department is provided a process for protecting the best interest of the population of each institution by segregating juveniles posing a disciplinary problem. Such a legislative framework is reasonably calculated to minister to the individual's best interest in the group setting involved.

The responsibility of the Department over children transferred to it by a disposition order under 10 O.S.Supp.1979 § 1116 is set forth in 10 O.S.1971 § 1117, wherein it is provided that the

> Department receiving custody shall have the right to, and shall be responsible for, the care and control of the child, and shall have the *duty* and authority to pro-

vide food, clothing, *shelter*, ordinary medical care, education, discipline for the child . . . (Emphasis added.)

We therefore conclude that the statutes impose a duty upon the Commission which the questioned construction is reasonably intended to fulfill.

The appellants propose that the use of sales tax revenue for the contested purpose is an illegal use of earmarked funds; violative of that provision of Article X, Section 19 requiring that . . . "No tax levied and collected for one purpose shall ever be devoted to another purpose." Appellants state that at the time the sales tax code was enacted in 1963, the use of funds so derived for purposes connected with housing, treatment or services to delinquent children was not contemplated by the act. The 1963 version of § 1303 was amended in 1965, however, to include delinquent children. The original statute, 68 O.S.Supp. 1963, § 1303, read in pertinent part as follows:

> (a) Ninety-nine percent (%) of the revenues derived hereunder from the collection of the principal of the tax levied by this Article shall be paid to the State Treasurer and placed to the credit of the State Assistance Fund for the purpose of assistance grants for the needy aged persons, needy dependent children, crippled children, needy blind persons, or providing services to homeless and neglected children, for assistance to permanently and totally disabled persons . . .

As the statute was amended in 1965, 68 O.S.Supp.1965 § 1303 (since amended 68 O.S.Supp.1976 § 1303), reads in pertinent part:

> (a) It is hereby declared to be the purpose of this Article to provide funds for the financing of the program provided by the Oklahoma Social Security Act of this State and to provide revenues for the support of the functions of State government of Oklahoma; and for this purpose and to this end it is hereby expressly provided that the revenues derived hereunder shall be paid to the State Treasurer and placed to the credit of the State

Assistance Fund for the purpose of assistance grants for the needy aged persons, needy dependent children, needy blind persons, and permanently and totally disabled persons, and for providing child welfare services and services for crippled children, and for providing services, care and treatment for dependent, homeless and neglected children, day care, delinquent children, deaf children, blind children, mentally retarded persons, for general assistance, commodity distribution, and emergency relief, for health care services as provided by Federal Law, for maintaining the Special Rehabilitation Fund, and for other programs assigned to the Department of Public Welfare pursuant to Federal or State law, and for payment of the costs of administration of the foregoing. . . .

■ We glean several instructive points from the 1965 version of the statute. First, services, care and treatment for delinquent children thereafter became a proper item of expenditure from the State Assistance Fund. Second, at the beginning of the section the purpose of the act is set out as a means to provide funds for the financing of the Social Security Act, and to provide for the general functions of state government. These two purposes dovetail easily into the constitutional purposes to be forwarded by the Social Security Article of the Constitution, Article XXV, which also deals with a special and general purpose for the Department of Public Welfare; the duty of administering the social security purposes set out in Section 1 of Article XXV, and additionally carrying out such other duties as may be prescribed from time to time. While comments above indicate that the tax has been appropriated for both a specific and general purpose, authorizing expenditures for delinquent juveniles both expressly and as a funded state purpose under the constitutional provision that the Department fulfill other duties legislatively imposed (Art. XXV, § 2), there remains appellants' objection that Article X, Section 19 requires that no tax levied and collected for one purpose shall ever be devoted to another purpose. The resolution of this offered infirmity requires examination of another constitutional provision approved by a referendum vote of the people, specifically Article X, Section 23, wherein the Legislature is given express authority to enact laws transferring either existing revenues or surpluses from one fund to another:

. . . Provided, however, that the Legislature may at any regular session or special session called for that purpose, enact laws to provide for additional revenues, other than ad valorem taxes, or transferring the existing revenues or surpluses from one fund to another, . .

We have stated previously, and are constrained to agree with that previous observation made, that in the light of the above quoted provision of Article X, Section 23 allowing transfer of existing funds without reenactment of the tax-levying statute 68 O.S.1971 § 1304, it is necessary to conclude Article X, Section 19 of the Constitution has been modified by such express authorization. *State ex rel. Hawkins v. Okla. Tax Commission, 462 P.2d 536 (Okl.1969).*

■ The appellants also call our attention to the provisions of Article V, Section 55 of the Oklahoma Constitution. This provision touches the area over which the Legislative Body absolutely controls the various agencies of state government, among which is the Welfare Commission, and that is finances. Our Constitution vests the whole matter of taxation exclusively within the power of the Legislature as limited by the Constitution. Okl.Const. Art. X § 12, § 13 and § 22. *In re Thomas' Estate, 192 Okl. 409, 136 P.2d 929 (1943), Herndon v. Anderson, 165 Okl. 104, 25 P.2d 326 (1933), Bd. of Commissioners of Okla. County v. Ryan, 107 Okl. 278, 232 P. 834 (1925).* As these cases state, the appropriation of moneys for the various State purposes rests in the sole discretion of the Legislature, limited only by the Constitution. Those limitations generally pertain to methods of levying and appropriating taxes, and leaves the State purposes served by the use of such tax money largely to the unfettered discretion of the Legislature. One of these Constitutional

limitations is Article V, Section 55, which outlines requirements of appropriations:

No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in the pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum.

The section requires that no money shall be paid out of the treasury or a fund unless it has been appropriated by law and is paid out within 2½ years of appropriation. Secondly, every appropriation must specify the sum and its object. A prolonged discussion of the effect of the requirement of an appropriation distinctly specifying the amount thereof is found in *Edwards v. Childers, 102 Okl. 158, 228 P. 472 (1924)*. Therein at p. 474 of the Pacific Reporter, this Court observed it would seem that an act appropriating public funds to be used by a department of state conflicts in no wise with the letter or spirit of this constitutional provision if it leaves no power in such department to use or expend any fund except such funds which the lawmakers reviewed, considered and thereafter determined to allocate to that department. The case of *Menefee v. Askew, 25 Okl. 623, 107 P. 159 (1910)*, was distinguished in *Edwards, supra*, on the strength of the above statement on the basis that the money appropriation therein was incomplete because the Fish & Game Department was directed to return that portion of the game license revenue not required for game management to the General Fund. Such provision did not meet the definite sum requirement of Article V, Section 55 because the return of funds provision negated any implication that the whole fund was appropriated to the department but did not limit or define the portion allocated to the department. In *Edwards v. Childers, supra*, a sales tax ap-

propriation to the Highway Department was upheld because, unlike *Menefee, supra*, the whole of the tax was appropriated to the department for use in highway construction, leaving no indefinite quality to the appropriation. *Edwards* explains the limitation arising from this portion of Article V, Section 55, as it regulates the expenditure of an entire fund, is satisfied if the fund is capable of exhaustion and the power of the department is limited to moneys which the Legislature has ordered to be expended. Such a state of affairs satisfies the spirit of the Constitutional provision (Art. V § 55) because the provision was originally brought into being to curb the power of the monarch; to save the people from the prodigality of the king. Quoting from *Edwards, supra, 228 P. 474* :

This requirement was not intended, nor was it originally so worded as to protect the people from the ill-advised judgment and extravagance of Parliament itself. It merely made the will of the lawmakers paramount to that of the crown in the expenditure of public funds. Neither the people nor their Parliament, by this law, sought to curb or regulate their own powers.

Just as in *Edwards, supra*, here we are confronted with a special tax, the entire sum of which is to be used for the purposes set out in 68 O.S.1976 Supp. § 1303. The definite sum of the appropriation is established under the allocation of the entire special tax by the computation of the amount of the tax received each year "and paid to the special fund of the state treasury pursuant to such provision." The requirement in Article V, Section 55 mandating a distinct specificity as to amount is satisfied if the sum appropriated is capable of ascertainment by mathematical calculation. *Wells v. Childers, 196 Okl. 339, 165 P.2d 358 (1945)*. As discussed in *Edwards v. Childers, 102 Okl. 158, 228 P. 472 (1924)*, the fact that the sum is capable of definite ascertainment only after the special tax is collected and turned over to the State Treasurer does not demonstrate the constitutional provision has been violated.

 The remaining objection raised by the appellants under the strictures of Article V, Section 55 of the Oklahoma Constitution relates to the requirement that moneys appropriated must be paid out within 2½ years after passage of the act. This Court has ruled on this contention adversely to these appellants in *State ex rel. Hawkins v. Okla. Tax Commission, 462 P.2d 536 (Okl. 1969)*, wherein this Court held in accord with the general rule as expressed in 81 C.J.S. States § 162, (now 81A C.J.S. States § 233 (1977)) "it is generally held that Constitutional provisions as to appropriations do not apply as to special funds devoted to special purposes," citing cases from Arkansas, Kansas, Louisiana, Mississippi, Montana, Nebraska, Oklahoma, New York and Texas.

 Another contention raised by appellants is the Department has no authority to settle or defend a lawsuit in its own right, and if it did do so the funds derived from that settlement would be surplus and subject to legislative appropriation. Title 56 O.S.1971 § 236 concisely authorizes the Department to employ counsel to represent the Commission in legal actions. Once representing the Department he has authority coextensive with that of counsel in the representation of a client generally and one of those powers is to recommend in his best professional opinion that settlement is, or is not advisable. The remaining point is the characterization of the funds settled for as "surplus." The transcript demonstrates clearly the lawsuit involved sought recovery of money owed the State on reimbursement for social service provided in 1972 and 1973. Title 56 O.S.1971 § 178(b) specifically provides moneys received as reimbursement to the State is credited to the State Assistance Fund or other fund at the Commission's discretion. Section (b) reads:

All moneys received by the State of Oklahoma from the United States for the purpose of aiding or reimbursing the State in the payment of assistance grants under the provisions of this Act shall be credited to the State Assistance Fund or to any other special fund that may be created by law for the payment of any specific assistance authorized in this Act, at the discretion of the Commission.

State Question No. 226, Initiative Petition No. 155, § 18. Adopted July 7, 1936.

 The appellants object to the allocation of special fund money to the construction of a capital improvement inasmuch as such is not an expressly listed purpose allocated funds in the legislative enactment earmarking state sales tax (and other) revenues to the State Assistance Fund, despite the fact that 56 O.S.1971 § 305(c) purports to expressly allow such use of funds. It bears repeating that the sole authority segregating (earmarking) the State's sales tax to the Department of Public Welfare for the use and benefit of certain state purposes is statutory authority passed by the Legislature. There is no Constitutional restriction on the freedom of the Legislature to change, amend or abolish this scheme at will. Indeed, there are various statutes [2] which remove revenues from the special fund prior to the basic statutory allocation of special fund moneys found in 56 O.S.1971 § 181a. An examination of Title 56, Okl. Statutes reveals at least 16 individual statutory directives authorizing transfer of funds from various assistance categories of 56 O.S.1971 § 181a to other purposes.[3] In addition to those 16 statutes, 56 O.S.1971 § 194, enacted in 1961, is a general transfer provision, only limiting the Department, with the approval of the Commission, to a determination of a need to maintain an equitable program before transferring funds generally. This statute reads:

The Oklahoma Department of Public Welfare is hereby authorized and directed, subject to the approval of the Oklaho-

---

2. Examples of these statutes are found at: 10 O.S.1971 § 456; 56 O.S.1971 § 307. Note 68 O.S.Supp.1976 § 1303 B provides 3½% of the gross sales tax revenues are never placed in the fund.

3. These statutes are: 56 O.S.1971 §§ 197.2, 197.3, 198.2, 198.6, 198.4(b), 198.8, 217, 218, 220, 305, 316, 318, 324, 325, 330 and 333.

ma Public Welfare Commission, to transfer funds now allocated to any or all of the categories of assistance, child welfare services, and emergency fund from any fund to any of such funds when necessary to provide an equitable program in all categories and assure proper services in child welfare and provide for necessities in the emergency fund.

The obvious intent behind these liberal transfer of fund provisions is to fund the multitude of duties which have been added from time to time to the responsibilities of the Department. Examples of duties imposed since the last revision of 56 O.S.1971 § 181a are found in the footnote.[4]

Title 56 O.S.1971 § 181a, the basic earmarking statute, was originally passed by the people of the State of Oklahoma by referendum vote in 1936 as Initiative Petition No. 155 § 22, nevertheless, it has been expressly amended five times by the Legislature.[5] We note that Article V, Section 7 of the Oklahoma Constitution specifically provides that the reserved powers of initiative and referendum do not deprive the Legislature of its power to amend or repeal a statutory provision passed by referendum vote of the people.

The previously quoted list of transfer provisions, although certainly not exhaustive, demonstrates that these statutory enactments passed after the earmarking statute, 56 O.S.1971 § 181a, are indicative of the Legislature's mandate that the funds apportioned to the various categories of assistance are not frozen to those uses, as shown by the transfer statutes later passed. As discussed previously, such transfer made after a tax levy has been validated by Constitutional Amendment, Article X, Section 23. Title 75 O.S.1971 § 22 is an express indication from the Legislature as to the effect of

the passage of a law which conflicts with a prior statutory enactment:

If the provisions of any code, title, chapter or article conflict with or contravene the provisions of any former code, title, chapter or article, the provisions of the latter code, title, chapter or article must prevail as to all matter and questions arising thereunder out of the same subject matter.

In consideration of the effect the transfer statutes last enacted have over the general earmarking statute, 56 O.S.1971 § 181a, we note at the outset that repeals by implication are not favored and all statutory provisions must be given effect if possible; unless the conflict so demonstrated is irreconcilable the earlier provision will not be repealed by the later enactment. *Smith v. State Bd. of Education, 190 Okl. 556, 126 P.2d 241 (1942).* Nothing short of irreconcilable conflict between statutes accomplishes a repeal by implication. *Sesow v. Swearingen, 552 P.2d 705 (Okl.1976), State ex rel. King v. White, 170 Okl. 126, 39 P.2d 69 (1934).* Where such a conflict exists, the later modifies the earlier, even where both sections were enacted into the same official codification. *Ex parte Burns, 88 Okl.Cr. 270, 202 P.2d 433 (1949).* Where the statutes conflict in part, repeal is not entire unless the later statute is so broad in scope, clear and explicit that its terms demonstrate it was intended to cover the whole subject matter, displacing the prior enactment, or so plainly repugnant that they cannot stand together. *Ritchie v. Raines, 374 P.2d 772 (Okl.Cr.1962).* Where statutes conflict in part, the one last passed, which is the later declaration of the Legislature, should prevail, superseding and modifying the former statute only to the extent of such conflict. *Consumers Co-op Assn. v.*

---

4. An illustrative but not complete example of duties which have been grafted onto the Welfare Department relative to eleemosynary organizations are: 74 O.S.Supp.1978 § 174; Community Youth Services Centers, 10 O.S.Supp. 1978 § 607, Juvenile Justice & Delinquency Services, 10 O.S. § 601 et seq.; Okl. Childrens Memorial Hospital, 56 O.S.Supp.1973 § 337; Okl. Childrens Center South Campus, 56 O.S.

1971 § 332; Okl. School for the Deaf and the Oklahoma School for the Blind, 56 O.S.1971 § 320; Schools for the Mentally Retarded, 56 O.S.1971 § 301; Transfer of six State Children's Homes, 10 O.S.1971 § 451, et seq.

5. Laws 1941 p. 384 § 4; Laws 1943 p. 129 § 1; Laws 1945 p. 181 § 1; Laws 1951 p. 158 § 5; Laws 1953 p. 229 § 2.

*Titus, 201 Okl. 344, 205 P.2d 1162 (1949). Dunlap v. Board of Commissioners of Carter Cty., 85 Okl. 295, 205 P. 1100 (1922).* The situation posed by these statutes is spoken to in a Territorial case, where the Court noted it does not follow that because similar statutory provisions are found, the earlier one must be abrogated, for if the intent to construct two systems is manifested the similarity of the statutes will not supply a valid reason to declare the earlier one repealed. *Garton v. Hudson-Kimberly Pub. Co., 8 Okl. 631, 58 P. 946 (1899).* Considering these principles, we determine that no statutory repeal of 56 O.S.1971 § 181a has taken place in the many statutory provisions allowing transfer of funds from the State Assistance Fund. The assistance fund money is appropriated in the first instance for the purposes and in the percentages set forth in § 181a, supra. Thereafter, the Department, under the footnoted authorities, may transfer these funds once allocated. While such dual provision for allocation of the State Assistance Fund assets has the effect of removing the obligatory nature of the allocations made in 181a, supra, the later statutes specify a second procedure for allocation of money once placed into the Fund's categories to various other purposes. Thus, this Court is not faced with the duty of declaring an implied repeal, as argued by the appellee, although the binding effect of 56 O.S.1971 § 181a has been abrogated.

 The appellants also contend the Department of Public Welfare bypassed applicable provisions of 75 O.S.1971 § 301 in the process of making the determination to build the incarceration facility. Appellants refer to the facility for closely supervised care and treatment of a portion of those juveniles classed as delinquent as a "new and radical treatment program." They rely on the previously mentioned characterization of those individuals as an additional class of juveniles over and above the statutory classifications of dependent and neglected, in need of supervision, and delinquent. This classification is then characterized as rule making, thus bringing the Department under the rule-making provisions

of the Administrative Procedures Act. Title 75 O.S.1971 § 301(1)(c) exempts the Welfare Department from the act except for the provisions of 75 O.S. § 304, entitled "Filing of Rules." Appellant then concludes that applicability of the rule-filing provision of § 304, which incorporates by reference 75 O.S.1971 § 251, dictates that §§ 252, 302(a)(3, 4), 303 and 308(c) also apply to the Department. We are not presented with this issue at this time inasmuch as this proposition rests on the characterization of the decision to build the questioned facility as a rule-making function. Rule is defined in 75 O.S.1971 § 301(2) as:

> . . . any agency statement of general applicability and future effect that implements, interprets or prescribes substantive law or policy or prescribes procedure or practice requirements of the agency. The term includes the amendment or repeal of a prior rule but *does not include* . . . (C) *statements* concerning only the *internal management* of an agency and *not affecting private rights.* (E.A.)

We have discussed that the transfer provisions of the statutes are designed to allow treatment, care and education on an individual basis to those juveniles entrusted to its care. This institution is designed to implement that overall individual treatment ideal by offering specialized care for a range of juveniles the Department is unable to treat effectively otherwise. One statement in the record brings this point clearly in focus, and that is that it is hard to treat those juveniles absent without leave, and the records indicate that problem is widespread.

Assuming, arguendo, that the decision is within the ambit of 75 O.S.1971 § 301(2), or practice requirements of the agency, the questioned action of deciding to build a facility for juveniles which the Department is required to provide care and treatment for, is excepted in the third exception quoted above. The addition to the Department's physical facilities concerns the inter-

nal management of the agency and is excepted by (C) of § 301(2) as it does not affect private rights under the record on appeal. An overall view of the transcript shows that the private rights of the surrounding community will be less involved with a secure facility than at present, in that there will be fewer juveniles absent from the facility and free in the surrounding community with the new facility than those facilities presently utilized at that location. Whether or not the exception found in 75 O.S.1971 § 301(2)(C) excepts the decision to place an individual within the Department in the institution so built because it affects the private rights of the juvenile assigned to the secure facility, is not presented as we have no indication in the record that any of the numerous plaintiffs has the standing to present such objection. We therefore must conclude that this action is not within the ambit of the provisions of 75 O.S.1971 § 301.

The Legislature, sovereign in its proper sphere of levying and appropriating tax money, has given broad authority to the Department of Public Welfare over many facets of state governmental affairs. In the field of Juvenile Services, the Legislature has imposed many varied duties dealing with both dependent and neglected children, children in need of supervision, and over a variety of services aimed at aiding delinquent minors and the public interest involved in their rehabilitation. Given these general duties placed on the Department to care for minors under its custody, and the specific duties imposed of housing and treatment of involved minors in conjunction with the authority to construct capital facilities under 56 O.S.1971 § 305(c) (which is not limited to improvement and repair by the language contained therein), we find that the plaintiffs in this action were properly denied the injunction sought to prohibit the building of the Sand Springs facility in question.

Considerable attention was devoted at trial to proving the questioned facility constituted a nuisance which a court of equity is empowered to enjoin. That course of argument was not proven by the weight of the evidence, and indeed, the evidence presented at the trial level pointed to the fact that this facility is designed to reduce the frequency of incidents which would have classified the institution as such over the frequency of absences now obtaining in that community. The clear weight of the evidence established that abatement of a nuisance by injunction was not justified. On appeal here the facility and the judgment of the lower court were impeached on the constitutional grounds the Court has here considered. This Court has determined the trial authority correctly apprized the constitutional objections there raised.

The judgment of the trial court denying permanent injunction in the premises is AFFIRMED.

Mr. Justice SIMMS, having certified his disqualification in the above entitled cause, Judge DWAIN BOX was appointed Special Justice to serve in his stead.

All Justices concur.