OSCN Found Document:DRUMMOND v. OKLAHOMA STATEWIDE VIRTUAL CHARTER SCHOOL BOARD

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 DRUMMOND v. OKLAHOMA STATEWIDE VIRTUAL CHARTER SCHOOL BOARD
2024 OK 53
Case Number: 121694
Decided: 06/25/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 53, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

GENTNER DRUMMOND, Attorney General for the State of Oklahoma, ex rel. STATE OF OKLAHOMA, Petitioner,
v.
OKLAHOMA STATEWIDE VIRTUAL CHARTER SCHOOL BOARD; ROBERT FRANKLIN, Chairman of the Oklahoma Statewide Virtual Charter School Board for the First Congressional District; WILLIAM PEARSON, Member of the Oklahoma Statewide Virtual Charter School Board for the Second Congressional District; NELLIE TAYLOE SANDERS, Member of the Oklahoma Statewide Virtual Charter School Board for the Third Congressional District; BRIAN BOBECK, Member of the Oklahoma Statewide Virtual Charter School Board for the Fourth Congressional District; SCOTT STRAWN, Member of the Oklahoma Statewide Virtual Charter School Board for the Fifth Congressional District, Respondents,
and
ST. ISIDORE OF SEVILLE CATHOLIC VIRTUAL SCHOOL, Intervenor.

APPLICATION TO ASSUME ORIGINAL JURISDICTION
FOR WRIT OF MANDAMUS AND DECLARATORY RELIEF

¶0 Petitioner brought this action seeking a writ of mandamus and declaratory relief that Respondents' contract with a religious charter school violates state and federal law and is unconstitutional. Original jurisdiction is assumed, and we grant the extraordinary and declaratory relief sought by Petitioner.

ORIGINAL JURISDICTION ASSUMED; 
WRIT OF MANDAMUS AND DECLARATORY RELIEF GRANTED.

Attorney General Gentner Drummond, Solicitor General Garry M. Gaskins, II, Assistant Solicitor General William Flanagan, Deputy General Counsel Brad Clark, and Assistant Solicitor General Kyle Peppler, Office of Attorney General, State of Oklahoma, Oklahoma City, Oklahoma, for Petitioner.

Cheryl Plaxico, Plaxico Law Firm, PLLC, Oklahoma City, Oklahoma, for Respondents.

Philip A. Sechler and J. Caleb Dalton, Alliance Defending Freedom, Lansdowne, Virginia, for Respondents.

Mark Lippelmann, Alliance Defending Freedom, Scottsdale, Arizona, for Respondents.

Michael H. McGinley, Steven A. Engel, and M. Scott Proctor, Dechert LLP, Washington, DC, for Intervenor.

John A. Meiser and Meredith H. Kessler, Notre Dame Law School Religious Liberty Clinic, Notre Dame, Indiana, for Intervenor.

Michael R. Perri and Socorro Adams Dooley, Perri Dunn, PLLC, Oklahoma City, Oklahoma, for Intervenor.

Bryan Cleveland and Erin Smith, Oklahoma State Department of Education, Oklahoma City, Oklahoma for Amici Curiae Oklahoma State Department of Education and State Superintendent of Public Instruction Ryan Walters.

Anthony J. Ferate and Andrew Lester, Spencer Fane, LLP, Oklahoma City, Oklahoma for Amici Curiae Oklahoma State Department of Education and State Superintendent of Public Instruction Ryan Walters.

Hiram Sasser and Holly M. Randall, First Liberty Institute, Plano, Texas, for Amici Curiae Oklahoma State Department of Education and State Superintendent of Public Instruction Ryan Walters.

Benjamin H. Odom, John H. Sparks, Michael W. Ridgeway, and Lisa M. Millington, Odom & Sparks, PLLC, Norman, Oklahoma, for Amici Curiae Taxpayers Melissa Abdo, Krystal Bonsall, Brenda Lené, Michelle Medley, Dr. Bruce Prescott, Rev. Dr. Mitch Randall, and Rev. Dr. Lori Walke.

Alex J. Luchenitser, Kenneth D. Upton, Jr., Kalli A. Joslin, Jenny Samuels, and Sarah Taitz, Americans United for Separation of Church and State, Washington, DC, for Amici Curiae Taxpayers Melissa Abdo, Krystal Bonsall, Brenda Lené, Michelle Medley, Dr. Bruce Prescott, Rev. Dr. Mitch Randall, and Rev. Dr. Lori Walke.

J. Douglas Mann, Tulsa, Oklahoma, for Amici Curiae Taxpayers Melissa Abdo, Krystal Bonsall, Brenda Lené, Michelle Medley, Dr. Bruce Prescott, Rev. Dr. Mitch Randall, and Rev. Dr. Lori Walke.

Robert Kim, Jessica Levin, and Wendy Lecker, Education Law Center, Newark, New Jersey, for Amici Curiae Taxpayers Melissa Abdo, Krystal Bonsall, Brenda Lené, Michelle Medley, Dr. Bruce Prescott, Rev. Dr. Mitch Randall, and Rev. Dr. Lori Walke.

Daniel Mach and Heather L. Weaver, American Civil Liberties Union Foundation, Washington, D.C., for Amici Curiae Taxpayers Melissa Abdo, Krystal Bonsall, Brenda Lené, Michelle Medley, Dr. Bruce Prescott, Rev. Dr. Mitch Randall, and Rev. Dr. Lori Walke.

Patrick Elliott, Freedom for Religion Foundation, Madison, Wisconsin, for Amici Curiae Taxpayers Melissa Abdo, Krystal Bonsall, Brenda Lené, Michelle Medley, Dr. Bruce Prescott, Rev. Dr. Mitch Randall, and Rev. Dr. Lori Walke.

Randall J. Yates and Melanie Wilson Rughani, Crowe & Dunlevy, Oklahoma City, Oklahoma for Amicus Curiae National Alliance for Public Charter Schools.

Richard D. White, Jr. and Joe M. Fears, Barber & Bartz, Tulsa, Oklahoma, for Amicus Curiae Seton Education Partners.

Gordon D. Todd, Dino L. LaVerghetta, and Mackenzi J. Siebert Ehrett, Sidley Austin, LLP, Washington D.C., for Amicus Curiae Seton Education Partners.

Mikayla Culbertson, Sidley Austin, LLP, Dallas, Texas, for Amicus Curiae Seton Education Partners.

Jason A. Reese, Goodwin/Lewis, PLLC, Oklahoma City, Oklahoma, for Amici Curiae Liberty Justice Center and the Jewish Coalition for Religious Liberty.

Brently C. Olsson, Cheek Law Firm, PLLC, Oklahoma City, Oklahoma, for Amicus Curiae Wisconsin Institute for Law & Liberty, Inc.

Richard M. Esenberg, Cory Brewer, and Skylar Croy, Wisconsin Institute for Law & Liberty, Inc., Milwaukee, Wisconsin, for Amicus Curiae Wisconsin Institute for Law & Liberty, Inc.

Ryan A. Haynie, Oklahoma Council of Public Affairs, Oklahoma City, Oklahoma, for Amicus Curia Oklahoma Council of Public Affairs.

Winchester, J.

¶1 Petitioner Gentner Drummond, Attorney General for the State of Oklahoma, ex rel. State of Oklahoma ("State") seeks a writ of mandamus directing Respondents Oklahoma Statewide Virtual Charter School Board, Robert Franklin, William Pearson, Nellie Tayloe Sanders, Brian Bobek, and Scott Strawn (collectively "Charter School Board") to rescind the Charter School Board's contract with Intervenor St. Isidore of Seville Catholic Virtual School ("St. Isidore") on grounds that the contract ("St. Isidore Contract") violates state and federal law. The State also seeks a declaratory judgment that the St. Isidore Contract is unconstitutional. The Court held oral argument on April 2, 2024.

¶2 Original jurisdiction is assumed. Okla. Const. art. 7, § 4. The Court invokes its publici juris doctrine to assume original jurisdiction in this matter as the State has presented the Court with an issue of public interest that warrants an immediate judicial determination. Indep. Sch. Dist. #52 of Okla. Cty. v. Hofmeister, 2020 OK 56, ¶ 60, 473 P.3d 475, 500. We grant the extraordinary and declaratory relief sought by the State. Ethics Comm'n of State of Okla. v. Cullison, 1993 OK 37, ¶ 4, 850 P.2d 1069, 1072.

FACTS AND PROCEDURAL HISTORY

¶3 The Oklahoma Legislature has a constitutional duty to establish a system of free public schools. Okla. Const. art. 13, § 1. In 1999, the Legislature enacted the Oklahoma Charter Schools Act ("Act"), 70 O.S. Supp. 2023, §§ 3-130 et seq., to help carry out this duty. Under the Act, a charter school is a public school, sponsored by an entity such as a school district, technology center, regional institution of higher education, federally recognized tribe, or the State Board of Education. 70 O.S. Supp. 2022, § 3-132. Charter schools use innovative methods and forms of accountability, provide academic choices for students and parents, and offer different professional opportunities for teachers and administrators. 70 O.S.2021, § 3-131. However, the Act requires that all charter schools be nonsectarian in their programs, admission policies, and other operations. 70 O.S. Supp. 2022, § 3-132.

¶4 The Archdiocese of Oklahoma City and the Diocese of Tulsa applied to the Charter School Board to establish St. Isidore, a religious virtual charter school. St. Isidore does not dispute that it is a religious institution. Its purpose is "[t]o create, establish, and operate" the school as a Catholic school. Specifically, it plans to derive "its original characteristics and its structure as a genuine instrument of the church" and participate "in the evangelizing mission of the church."[1] And

[r]ooted in the Catholic understanding of the human person and her or his relationship with God and neighbor, [St. Isidore] fully embraces the teachings of the Catholic Church's Magisterium, and [St. Isidore] fully incorporates these into every aspect of the School, including but not limited to its curriculum and co-curricular activities.[2]

St. Isidore has two members, the Archbishop of the Archdiocese of Oklahoma City and the Bishop of the Diocese of Tulsa. A Board of Directors (between 5 and 15 members) will direct and manage the school; not more than two non-Catholics may serve on the board.

¶5 The Charter School Board is the state body with the sole authority to form virtual charter schools under the Act. 70 O.S.2021, § 3-145.1.[3] On June 5, 2023, the Charter School Board voted 3-2 to approve St. Isidore's revised application to become an Oklahoma virtual charter school. On October 9, 2023, the Charter School Board voted again 3-2 to approve St. Isidore's contract for sponsorship. St. Isidore was created with the Charter School Board as its government sponsor. On October 16, 2023, the parties executed the St. Isidore Contract. The St. Isidore Contract commences on July 1, 2024.

¶6 A Virtual Charter School Authorization and Oversight Manual provides the model template for a virtual charter school contract. However, the Charter School Board can negotiate contract terms that add to or vary from the model contract, if the terms comply with "applicable state, federal, local, and/or tribal law." Okla. Admin. Code § 777:10-3-3(g).

¶7 The St. Isidore Contract varies significantly from the model contract. The St. Isidore Contract recognizes that certain rights, exemptions, or entitlements apply to St. Isidore as a religious organization under state and federal law, including the "ministerial exception" and aspects of the "church autonomy doctrine."[4] The St. Isidore Contract does not contain the model contract section titled "Prohibition of religious affiliation," which provides that, except as permitted by applicable law, a charter school "shall be nonsectarian in its programs." Instead, the St. Isidore Contract states that St. Isidore has the right to freely exercise its religious beliefs and practices consistent with its religious protections.[5] Under the model contract, a charter school must warrant "that it is not affiliated with a nonpublic sectarian school or religious institution." In the St. Isidore Contract, St. Isidore warrants that it is affiliated with a nonpublic sectarian school or religious institution.[6]

¶8 Due to the nature of the St. Isidore Contract, the State seeks a writ of mandamus directing the Charter School Board to rescind the St. Isidore Contract. The question before this Court is whether the St. Isidore Contract violates state and federal law and is unconstitutional. We hold that the St. Isidore Contract violates the Oklahoma Constitution, the Act, and the federal Establishment Clause. St. Isidore is a public charter school. The Act does not allow a charter school to be sectarian in its programs, admissions policies, employment practices, and operations. The Act's mandate is in line with the Oklahoma Constitution and the Establishment Clause, which both prohibit the State from using public money for the establishment of a religious institution. St. Isidore's educational philosophy is to establish and operate the school as a Catholic school. Under both state and federal law, the State is not authorized to establish or fund St. Isidore.

 

DISCUSSION

I. OKLAHOMA'S CONSTITUTION AND THE ACT PROHIBIT THE ST. ISIDORE CONTRACT. 

A. Article 2, Section 5 of the Oklahoma Constitution prohibits the State from using public money for the benefit or support of any religious institution.

¶9 We first look to the Oklahoma Constitution. Article 2, Section 5 states:

No public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such.

Okla. Const. art. 2, § 5. The objective of construing the Oklahoma Constitution is to give effect to the framers' intent, as well as the people adopting it. Shaw v. Grumbine, 1929 OK 116, ¶ 30, 278 P. 311, 315 (quoting Lake Cty. v. Rollins, 130 U.S. 662 (1889)).

¶10 Our Court discussed the framers' intent in drafting Article 2, Section 5 in Prescott v. Oklahoma Capitol Preservation Commission, 2015 OK 54, 373 P.3d 1032, wherein we held that the placement of a Ten Commandments monument on the grounds of the Oklahoma State Capitol violated Article 2, Section 5. The Court concluded that although the State did not spend public funds to acquire the monument, the monument operated "for the use, benefit or support of a sect or system of religion." Id. ¶ 7, 373 P.3d at 1034. The Court held:

The plain intent of Article 2, Section 5 is to ban State Government, its officials, and its subdivisions from using public money or property for the benefit of any religious purpose. Use of the words "no," "ever," and "any" reflects the broad and expansive reach of the ban.

Id. ¶ 4, 373 P.3d at 1033. Justice Taylor, concurring, went into greater detail regarding the framers' intent, citing Albert H. Ellis, the Second Vice President of the Constitutional Convention. Mr. Ellis explained that Article 2, Section 5:

[N]ot only guards the citizens right to be free from taxation for the support of the church, but protects the rights of all denominations, however few the number of their respective adherents, by with-holding any incentive that might prompt any ecclesiastical body to participate in political struggles and by reason of their numbers exert an undue influence and become beneficiaries at the expense of the public and a menace to weaker denominations and ultimately destructive of rel[i]gious liberty.

Id. ¶ 5, 373 P.3d at 1037 (Taylor, J., concurring in denial of reh'g) (citations omitted). The concurrence also noted that the framers were religious men who started their proceedings during the Convention with prayers. However, "they recognized the necessity of a complete separation of church and state and sought to prevent the ills that would befall a state if they failed to provide for this complete separation in the Oklahoma Constitution." Id. ¶ 6, 373 P.3d at 1038.[7]

¶11 As contended by the Amici Curiae in this case, the Prescott Court also wrestled with whether Article 2, Section 5 is a Blaine Amendment. Justice Gurich noted in her concurrence:

[I]n spite of the court filings in this case, which conclude that [Article 2, Section 5] of the Oklahoma Constitution is a Blaine Amendment, nothing in the recorded history of the Oklahoma Constitutional Convention, this Court's case law, or any other historical evidence supports this conclusion. In fact, all evidence is to the contrary.

Id. ¶ 16, 373 P.3d at 1050 (Gurich, J., concurring in denial of reh'g). After discussing the long history of the Blaine Amendment in detail, she concluded:

Characterizing [Article 2, Section 5] of the Oklahoma Constitution as a Blaine Amendment completely ignores the intent of the founders of the Oklahoma Constitution who purposely sought to ensure future generations of Oklahomans would be free to practice religious freedom without fear of governmental intervention.

Id. ¶ 24, 373 P.3d at 1052.[8]

¶12 The framers' intent is clear: the State is prohibited from using public money for the "use, benefit or support of a sect or system of religion." Although a public charter school, St. Isidore is an instrument of the Catholic church, operated by the Catholic church, and will further the evangelizing mission of the Catholic church in its educational programs. The expenditure of state funds for St. Isidore's operations constitutes the use of state funds for the benefit and support of the Catholic church. It also constitutes the use of state funds for "the use, benefit, or support of . . . a sectarian institution." The St. Isidore Contract violates the plain terms of Article 2, Section 5 of the Oklahoma Constitution. Enforcing the St. Isidore Contract would create a slippery slope and what the framers' warned against--the destruction of Oklahomans' freedom to practice religion without fear of governmental intervention. See Gurney v. Ferguson, 1941 OK 397, ¶ 16, 122 P.2d 1002, 1005 (warning of an "at least partial control of [sectarian] schools by successive legislative enactment" and noting "[f]rom partial control to an effort at complete control might well be the expected development").

B. Article 1, Section 5 of the Oklahoma Constitution and the Act mandate that public charter schools are nonsectarian.

¶13 The Oklahoma Constitution also delegates to the Legislature the constitutional duty to establish and maintain a system of free public schools. Okla. Const. art. 13, § 1. As part of its duty, the Constitution mandates:

Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control[.]

Okla. Const. art. 1, § 5.

¶14 The Legislature enacted the Act to help carry out this constitutional duty. Under the Act, a charter school is a public school, sponsored by a governmental entity. 70 O.S. Supp. 2022, § 3-132(D). In line with the constitutional mandate, the Act requires that all charter schools be nonsectarian in their programs, admission policies, and other operations. 70 O.S.2021, § 3-136(A)(2). The Act prohibits the Charter School Board from sponsoring a charter school program that is affiliated with a nonpublic sectarian school or religious institution. Id. Our Court has defined "sectarian institution" as a "school or institution of learning which is owned and controlled by a church and which is avowedly maintained and conducted so that the children of parents of that particular faith would be taught in that school the religious tenets of the church." Gurney, 1941 OK 397, ¶ 7, 122 P.2d at 1003.

¶15 There is no question that St. Isidore is a sectarian institution and will be sectarian in its programs and operations. As set forth above, the Charter School Board had to alter various terms of the model contract to draft the St. Isidore Contract, allowing it to operate as a religious charter school. However, in changing the various terms of the model contract, the St. Isidore Contract violates the plain language of the Act and the Oklahoma Constitution.

II. AS A PUBLIC CHARTER SCHOOL, ST. ISIDORE IS A GOVERNMENTAL ENTITY AND A STATE ACTOR. 

¶16 The Charter School Board and St. Isidore contend that the Oklahoma Constitution provision requiring that Oklahoma's system of public schools be free from sectarian control does not apply to St. Isidore because St. Isidore is a private corporation and not a public school. They further argue that despite its sectarian nature, the St. Isidore Contract does not violate the Oklahoma Constitution or the Act because St. Isidore is merely a private actor contracting with the State to perform a substantial benefit for the State. The Charter School Board and St. Isidore rely primarily on two Oklahoma cases to support their contention: Murrow Indian Orphans Home v. Childers, 1946 OK 187, 171 P.2d 600, and Oliver v. Hofmeister, 2016 OK 15, 368 P.3d 1270.

¶17 These cases are distinguishable from the facts before us. In Murrow, the Court held that state funds paid to a sectarian institution in exchange for the housing and care of orphans discharged the State's duty to provide for needy children and did not violate Article 2, Section 5 of the Oklahoma Constitution. 1946 OK 187, ¶ 9, 171 P.2d at 603. However, the Court specifically noted that the institution had sectarian character as an organization and in its management but denied that it indoctrinated its dependent children. Instead, the children were allowed complete freedom of worship, and the orphanage did not mandate attendance at its church services. Id. ¶ 2, 171 P.2d at 601. We determined, "[i]t is not the exposure to religious influence that is to be avoided; it is the adoption of sectarian principles or the monetary support of one or several or all sects that the [S]tate must not do." Id. ¶ 7, 171 P.2d at 602.

¶18 In Oliver, the Court found that a state-funded scholarship program allowing parents of students with disabilities to apply for a scholarship for their children to attend private school did not violate Article 2, Section 5. 2016 OK 15, ¶ 27, 368 P.3d at 1277. Under the legislation at issue, the State would offset tuition at participating private schools through scholarships to eligible students. The State paid the scholarship funds directly to the parent and participation was purely voluntary. Any private school--sectarian or non-sectarian--was eligible to participate in the program. The Court held the scholarship program did not "directly fund religious activities" in violation of Article 2, Section 5. Id. ¶ 21, 368 P.3d at 1276. The program did not disperse funds directly to any private sectarian school until a parent of an eligible student made a private, independent selection. Any benefit to a participating sectarian school arose solely from the choice of the parent, not from any decree from the State. Id. ¶ 26, 368 P.3d at 1277.

¶19 Here, there is no question that the State will provide monetary support to teach a Catholic curriculum, and students at St. Isidore will be required to participate in the religious curriculum, both of which the Murrow Court disallowed. The funding will go directly to St. Isidore, dissimilar from giving scholarship funds to parents as in Oliver. The State will be directly funding a religious school and encouraging students to attend it.

¶20 Even more importantly, the present case does not involve a religious entity unaffiliated with the State providing the State with a substantial benefit. Instead, these cases are inapplicable because St. Isidore, a public charter school, is a governmental entity and state actor.

A. St. Isidore is a governmental entity under the Act. 

¶21 The Act expressly states that a "charter school" means a "public school" established by contract with a school district or other governmental entity. See 70 O.S. Supp. 2022, § 3-132(D). The Oklahoma School Code defines "public school" as "all free schools supported by public taxation." 70 O.S.2021, § 1-106.[9] Charter schools must "be equally free and open to all students as traditional public schools." Id. § 3-135(A)(9). They must not "charge tuition or fees." Id. § 3-136(A)(10). Oklahoma charter schools fall within the definition of a public school.

¶22 Charter schools are also "subject to the same academic standards and expectations as existing public schools." Id. §§ 3-135(A)(11), 3-136(A)(10). Charter schools must comply with the same rules that govern public schools on school-year length, bus transportation, student testing, student suspension, and financial reporting and auditing. Id. §§ 3-135(C), 3-136(A)(4), (6), (11), (12), and (18), 3-141(A), 3-145.3(E). A charter school must also comply with all "laws relating to the education of children with disabilities in the same manner as a school district." Id. § 3-136(A)(7).

¶23 Charter schools receive state "funding in accordance with statutory requirements and guidelines for existing public schools." Id. § 3-135(A)(12). The employees of charter schools are eligible for the same State retirement benefits that Oklahoma provides teachers at other public schools and the insurance programs available to the employees of the charter schools' governmental sponsors. Id. §§ 3-136(A)(14), (15).

¶24 The Charter School Board is subject to the same conflict of interest and continuing education requirements as a local school board. Id. §§ 3-136(A)(6), 3-145.3(D)-(F). The Charter School Board exercises significant ongoing oversight and evaluation of all sponsored virtual charter schools through data collection, site visits, audits, attendance at the school's governing board meetings, performance reports, and external school reviews. The Charter School Board has the power to place the school on probation if it finds deficiencies and ultimately close the school if it fails to resolve its deficiencies. See 70 O.S. Supp. 2023, § 3-132.2(A).

¶25 Charter schools, like other governmental entities, must "comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act." 70 O.S.2021, § 3-136(A)(16). Each public charter school operates as its own "local education agency" and is covered under the Oklahoma Governmental Tort Claims Act as its own "school district." Id. §§ 3-136(A)(13), 3-142(C), 3-145.3(C).

¶26 The Legislature created Oklahoma charter schools, and Oklahoma law treats them as public schools and governmental bodies. They have many of the same privileges, responsibilities, and legal requirements that govern traditional public schools. They are creatures of state law and may only operate under the authority granted to them by their charters with the State. St. Isidore will be acting as a surrogate of the State in providing free public education as any other state-sponsored charter school. Therefore, St. Isidore, a public charter school, is a governmental entity and state actor.[10]

 

 

B. St. Isidore is a state actor under the U.S. Supreme Court state actor tests.

¶27 The Charter School Board and St. Isidore claim that St. Isidore is not a state actor by the legislative designation of public school. Their argument still fails because a private actor may nonetheless be deemed a state actor whenever there is a close nexus between the State and the challenged action that private behavior may be treated as that of the State. See Jackson v. Metro. Edison Co., 419 U.S. 345, 351 (1974); see also Scott v. Okla. Secondary Sch. Activities Ass'n, 2013 OK 84, ¶ 28, 313 P.3d 891, 900 (holding a private not-for-profit organization was a state actor when it behaved like a state agency).

¶28 The U.S. Supreme Court has applied five "state actor" tests over the years, i.e., the "significant encouragement" test, the "willful participant in joint activity" test, the government "control" test, the "entwinement" test, and the "public function" test. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 298 (2001); Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); see also VDARE Found. v. City of Colorado Springs, 11 F.4th 1151, 1160 (10th Cir. 2021), cert. denied, 142 S. Ct. 1208 (Feb. 28, 2022). "If one of the tests indicates a party is a state actor, that alone is sufficient to find the party a state actor." Anaya v. Crossroads Managed Care Sys., Inc., 195 F.3d 584, 596 (10th Cir. 1999).

¶29 St. Isidore is a state actor under at least two tests--the entwinement and public function tests. First, under the entwinement test, the U.S. Supreme Court has stated that "a nominally private entity [i]s a state actor . . . when it is 'entwined with governmental policies,' or when the government is 'entwined in [its] management or control.'" Brentwood Acad., 531 U.S. at 296 (quoting Evans v. Newton, 382 U.S. 296, 299 (1966)). As set forth above, Oklahoma charter schools are entwined with the State. Governmental entities serve as sponsors for the charter schools. As its sponsor, the Charter School Board will provide oversight of the operation for St. Isidore, monitor its performance and legal compliance, and decide whether to renew or revoke St. Isidore's charter. As a state-created entity, charter schools also receive many of the same legal protections and benefits as their government sponsor. The State's entwinement expands to the internal operations and affairs of the charter schools.

¶30 Second, under the "public function" test, it is sufficient to show that "the private entity performs a traditional, exclusive public function." Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019). The provision of education may not be a traditionally exclusive public function, but the Oklahoma Constitutional provision for free public education is exclusively a public function. Even more, a private entity is a state actor when the government has outsourced one of its constitutional obligations to the entity. Id. at 810 n.1.

¶31 The Charter School Board and St. Isidore rely primarily on Rendell-Baker v. Kohn, 457 U.S. 830 (1982), to support that Oklahoma charter schools are not state actors. The U.S. Supreme Court in Rendell-Baker held that a private school for troubled youths was not a state actor for purposes of employment-related claims. The state regulated the school and provided substantial governmental funding. The school obtained most of its students through referrals from public schools. Id. at 832-35, 843. However, the key difference between Rendell-Baker and this case is Oklahoma charter schools are public schools created through governmental action, not private like in Rendell-Baker.

¶32 A recent Fourth Circuit Court of Appeals case, Peltier v. Charter Day School, Inc., 37 F.4th 104 (4th Cir. 2022), cert. denied, 1143 S. Ct. 2657 (June 26, 2023), is instructive. The en banc Fourth Circuit concluded that a charter school operator was a state actor for purposes of the students' equal protection claim, challenging a dress code requirement that females wear skirts. The students in Peltier argued that the charter school qualified as a state actor because the operation of schools, designated by North Carolina law as public, performed an exclusively public function. And by statute, the state had delegated its duty, in part, to charter school operators to fulfill the state's constitutional duty to provide free, universal schools. Id. at 116.

¶33 Relying on Rendall-Baker, the charter school argued that it was merely a private entity fulfilling a contract with the state like the Charter School Board and St. Isidore contend in this case. The school argued that the state did not require a student to attend any specific charter school, and the state had not delegated to charter schools the responsibility to educate North Carolina students. Id.

¶34 The statutory framework of North Carolina is much like Oklahoma's Act, and charter schools may only operate under the authority granted to them by their charters with the state. Within its statutes, North Carolina also designated its charter schools as public. The Peltier Court noted that rejecting the state's designation of such schools as public institutions would infringe on North Carolina's sovereign prerogative, undermining fundamental principles of federalism. Id. at 121.

¶35 Applying the "public function" test, the Peltier Court concluded that the charter school operated in furtherance of the state's constitutional obligation to provide free, universal education to its residents. The court rejected the argument that charter schools were an "alternative method" of education--such as private schools or home schooling--because that position ignored the universal and free nature of the public school system. In operating a school that is part of the North Carolina public school system, the charter school performed a function traditionally and exclusively reserved to the state. Id. at 119.

¶36 Importantly, the Peltier court also distinguished Rendell-Baker by noting that in material contrast to the personnel decisions at issue in Rendell-Baker:

[The charter school] implemented its dress code, including the skirts requirement, as a central component of the public school's educational philosophy . . . . By [the charter school's] own admission, the skirts requirement directly impacts the school's core educational function and, thus, directly impacts the constitutional responsibility that North Carolina has delegated to [the charter school].

Id. at 120.

¶37 As in Peltier, Oklahoma fulfilled its constitutional duty, in part, with the passage of the Act, which sets the procedure for the creation and funding of public charter schools. Oklahoma exercised its sovereign prerogative to treat these state-created and state-funded schools as public institutions that perform the traditionally exclusive government function of operating the State's free public schools. St. Isidore will implement a religious curriculum and activities that directly impact the school's core education function, and thus, the constitutional responsibility that Oklahoma delegated to the charter schools. Just as in Peltier, St. Isidore is a public charter school and a state actor.[11]

III. THE ESTABLISHMENT CLAUSE PROHIBITS THE ST. ISIDORE CONTRACT. 

¶38 We next look at the U.S. Constitution. While we have already found the St. Isidore Contract to violate two provisions of the Oklahoma Constitution, which affords bona fide, separate, adequate, and independent grounds upon which today's opinion is rested, the St. Isidore Contract also violates the federal Establishment Clause. See Michigan v. Long, 463 U.S. 1032, 1041 (1983).

¶39 Under the Establishment Clause of the First Amendment, made binding upon the States through the Fourteenth Amendment, Oklahoma cannot pass laws "which aid one religion, aid all religions, or prefer one religion over another." Everson v. Bd. of Educ. of Ewing Twp., 330 U.S. 1, 15 (1947). The Establishment Clause prohibits government spending in direct support of any religious activities or institutions. Id. The Establishment Clause also prohibits the government from participating in the same religious exercise that the law protects when performed by a private party. See Locke v. Davey, 540 U.S. 712, 718 (2004) (recognizing that there is "play in the joints" between what the Establishment Clause permits, and the Free Exercise Clause compels). Thus, an Establishment Clause case hinges on whether religious activity involves a "state actor" or constitutes "state action."

¶40 The Establishment Clause cases from the U.S. Supreme Court have not dealt with the creation of a religious public school. Rather, the cases have revolved around religious acts in public schools. In Kennedy v. Bremerton School District, 597 U.S. 507, 541-42 (2022), the U.S. Supreme Court discussed comparable situations that violated the Establishment Clause, specifically: Zorach v. Clauson, 343 U.S. 306 (1952), where the Court held that requiring or persuading students to spend time in religious instruction was a violation; Lee v. Weisman, 505 U.S. 577 (1992), where the Court held that reciting prayers as part of an official graduation ceremony because the school practically compelled attendance and participation was a violation; and Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000), where the Court held that broadcasting prayer over the public address system and activities where students were required or expected to participate was a violation. These cases demonstrate the Establishment Clause prohibits public schools (state actors) from requiring or expecting students to participate in religious activities.

¶41 Because it is a governmental entity and a state actor, St. Isidore cannot ignore the mandates of the Establishment Clause, yet a central component of St. Isidore's educational philosophy is to establish and operate the school as a Catholic school. St. Isidore will fully incorporate Catholic teachings into every aspect of the school, including its curriculum and co-curricular activities. It will require students to spend time in religious instruction and activities, as well as permit state spending in direct support of the religious curriculum and activities within St. Isidore--all in violation of the Establishment Clause. We hold that the St. Isidore Contract establishing a religious public charter school violates the Establishment Clause.

IV. THE FREE EXERCISE CLAUSE IS NOT IMPLICATED IN THIS CASE. 

¶42 The Charter School Board and St. Isidore contend that the Free Exercise Clause of the First Amendment prohibits a state from denying St. Isidore its right to operate as a charter school solely because it is religious. In support, they point to recent U.S. Supreme Court decisions that held that once a state makes a public benefit available to its citizens, the state cannot exclude a religious entity's eligibility solely because of its religious affiliation. If a state does so, it violates the Free Exercise Clause. See Carson v. Makin, 596 U.S. 767 (2022) (holding the "nonsectarian" requirement of Maine's tuition assistance program for private secondary schools violated the Free Exercise Clause); Espinoza v. Mont. Dep't of Rev., 591 U.S. 464 (2020) (concluding the state scholarship program for students attending private schools was permissible under the Free Exercise Clause); Trinity Lutheran Church of Columbia, Inc. v. Comer, 582 U.S. 449 (2017) (holding the denial of grants to religiously affiliated applicants for purchase of rubber playground surfaces violated the Free Exercise Clause) (collectively "the Free Exercise Trilogy").

¶43 The Free Exercise Trilogy cases do not apply to the governmental action in this case. St. Isidore is a state-created school that does not exist independently of the State. Unlike the private entities in the Free Exercise Trilogy cases, St. Isidore was created in furtherance of the State's objective of providing free public education. The Carson Court specifically distinguished that the private schools at issue "were not public schools," noting all the differences between private schools and public schools. 596 U.S. at 783-85. St. Isidore further contracted with the State to receive complete and direct financial support for a public charter school--funding mandated by the Act. In Carson, the Court noted that the state did not cover the full cost of the private secondary schools. Id. at 771. In Espinoza, the individual receiving the state scholarship determined its allocation, not the state. 591 U.S. at 474. In Trinity Lutheran, the government funding was for a non-religious use, playground resurfacing. 582 U.S. at 464-65. Finally, St. Isidore is not a religious private school or organization seeking to be treated equally with other private entities relative to a tax credit, grant, or tuition assistance.

¶44 The differences between the Free Exercise Trilogy cases and this case are at the core of what this case entails--what St. Isidore requests from this Court is beyond the fair treatment of a private religious institution in receiving a generally available benefit, implicating the Free Exercise Clause. It is about the State's creation and funding of a new religious institution violating the Establishment Clause.[12] Even if St. Isidore could assert free exercise rights, those rights would not override the legal prohibition under the Establishment Clause. Compliance with the Establishment Clause in this case is a compelling governmental interest that satisfies strict scrutiny under other provisions of the First Amendment. See, e.g., Widmar v. Vincent, 454 U.S. 263, 270-71 (1981).

CONCLUSION

¶45 Under Oklahoma law, a charter school is a public school. As such, a charter school must be nonsectarian. However, St. Isidore will evangelize the Catholic faith as part of its school curriculum while sponsored by the State. This State's establishment of a religious charter school violates Oklahoma statutes, the Oklahoma Constitution, and the Establishment Clause. St. Isidore cannot justify its creation by invoking Free Exercise rights as a religious entity. St. Isidore came into existence through its charter with the State and will function as a component of the State's public school system. This case turns on the State's contracted-for religious teachings and activities through a new public charter school, not the State's exclusion of a religious entity. The Court grants the extraordinary and declaratory relief sought by the State. The St. Isidore Contract violates state and federal law and is unconstitutional. By writ of mandamus, we direct the Charter School Board to rescind its contract with St. Isidore. Any petition for rehearing regarding this matter shall be filed within ten (10) days of the date of this opinion.

ORIGINAL JURISDICTION ASSUMED; 
WRIT OF MANDAMUS AND 
DECLARATORY RELIEF GRANTED. 

Kauger, Winchester, Edmondson, Combs, Gurich, and Darby, JJ., concur.

Rowe, V.C.J. (by separate writing), concurs in part and dissents in part.

Kuehn, J. (by separate writing), dissents.

Kane, C.J., recused.

FOOTNOTES

[1] Pet'r's. App. I, Ex. B, p. 92.

[2] Pet'r's. App. I, Ex. B, p. 276.

[3] On July 1, 2024, the Statewide Charter School Board will assume the duties of the Charter School Board. 70 O.S. Supp. 2023, § 3-132.1.

[4] Pet'r's. App. I, Ex. A, p. 3.

[5] Pet'r's. App. I, Ex. A, p. 13.

[6] Pet'r's. App. I, Ex. A, p. 20.

[7] After Prescott, Oklahoma voters in 2016, through State Question 790, were granted the opportunity to repeal Article 2, Section 5 of the Oklahoma Constitution. The voters declined to do so.

[8] Other Justices also concluded that Article 2, Section 5 is not a Blaine Amendment. Justice Taylor noted that in his very complete discussion of Article 2, Section 5, Mr. Ellis never mentioned the Blaine Amendment and explained how any reliance on Article 2, Section 5 as a Blaine Amendment is misplaced. Prescott, 2015 OK 54, ¶¶ 5, 17-20, 373 P.3d at 1037, 1040-41 (Taylor, J., concurring in denial of reh'g). Justice Edmondson noted that the origin of Article 2, Section 5 was with Thomas Jefferson and the example set by the People of Virginia and not the 1876 Blaine Amendment. Id. ¶ 1, 373 P.3d at 1036 (Edmondson, J., concurring in denial of reh'g). Justice Combs, dissenting from the Court, stated that he "would agree with the other Justices of this Court that [Article 2, Section 5] is not Oklahoma's version of a Blaine Amendment. The breadth and scope of [Article 2, Section 5] differ significantly from the failed Blaine Amendment." Id. ¶ 12, 373 P.3d at 1057 (Combs, V.C.J., dissenting to denial of reh'g).

[9] The St. Isidore Contract also used a similar definition of "Public School." It states a "school that is free and supported by funds appropriated by the Legislature[.]" Pet'r's. App. I, Ex. A, p. 3.

[10] See, e.g., Nat'l Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 192 (1988) (state universities); United States v. Ackerman, 831 F.3d 1292, 1295-1300 (10th Cir. 2016) (National Center for Missing and Exploited Children).

[11] The Tenth Circuit Court of Appeals has also treated charter schools as state actors. See Coleman v. Utah State Charter Sch. Bd., 673 F. App'x 822, 830 (10th Cir. 2016) (noting "charter schools are public schools using public funds to educate school children"); Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1188 (10th Cir. 2010) (holding a charter school was a governmental entity); Milonas v. Williams, 691 F.2d 931, 940 (10th Cir. 1982) (holding state funding, contracts with state, and extensive state regulation were some of the facts that demonstrated sufficiently close nexus between state and operators of school). Other federal courts across the county, including the Third and Ninth Circuits, have treated charter schools as governmental entities or state actors. See, e.g., Family Civil Liberties Union v. Dep't of Children & Families, 837 F. App'x 864, 896 (3d Cir. 2020); Nampa Classical Acad. v. Goesling, 447 F. App'x 776, 777-78 (9th Cir. 2011); Jones v. Sabis Educ. Sys., Inc., 52 F. SupP.2d 868, 876, 879 (N.D. Ill. 1999); Daugherty v. Vanguard Charter Sch. Acad., 116 F. SupP.2d 897, 906 (W.D. Mich. 2000); United States v. Minn. Transitions Charter Schs., 50 F. SupP.3d 1106, 1120 (D. Minn. 2014); Patrick v. Success Acad. Charter Schs., 354 F. SupP.3d 185, 209 n.24 (E.D.N.Y. 2018); Riester v. Riverside Cmty. Sch., 257 F. SupP.2d 968, 972-73 (S.D. Ohio 2002); Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist., 908 F. SupP.2d 597, 604-05 (M.D. Pa. 2012).

[12] The Charter School Board and St. Isidore contend that the mandate that a charter school is nonsectarian violates the Oklahoma Religious Freedom Act ("ORFA"), 51 O.S. Supp. 2023, §§ 251 et seq. They rely on a recent amendment to ORFA, which states that "[i]t shall be deemed a substantial burden to exclude any person or entity from participation in or receipt of governmental funds, benefits, programs, or exemptions based solely on the religious character or affiliation of the person or entity." 51 O.S. Supp. 2023, § 253(D). St. Isidore claims that the ORFA implicitly overrode section 3-132 of the Act as the "most recently enacted law." We disagree. The Legislature amended the Act after the most recent amendment to ORFA. See Laws 2023, SB 404, c. 189, § 2, eff. November 1, 2023, available at http://www.oklegislature.gov/BillInfo.aspx?Bill=sb%20404&Session=2300; Laws 2023, SB 516, c. 323, § 5, eff. July 1, 2024, available at http://www.oklegislature.gov/BillInfo.aspx?Bill=sb516&Session=2300. We have held that "[w]here statutes conflict in part, the one last passed, which is the later declaration of the Legislature, should prevail, superseding and modifying the former statute only to the extent of such conflict." City of Sand Springs v. Dep't of Pub. Welfare, 1980 OK 36, ¶ 28, 608 P.2d 1139, 1151. The section regarding the prohibition on sectarian schools remained in the amended Act, and the Act controls over the ORFA. Thus, the ORFA did not override the Act's requirement that charter schools be nonsectarian. Even more, St. Isidore is a governmental entity and state actor, not a private entity. The ORFA is not implicated in this case for the same reasons the Free Exercise Clause is not implicated.

 

 

ROWE, V.C.J., CONCURRING IN PART AND DISSENTING IN PART:

¶1 I concur with the Majority that Article 1, Section 5 of the Oklahoma Constitution mandates that public charter schools are nonsectarian.

¶2 I dissent to the remainder of the Majority's opinion.

 

 

KUEHN, J., DISSENTING:

¶1 I dissent to the Majority's opinion. St. Isidore would not become a "state actor" merely by contracting with the State to provide a choice in educational opportunities. By allowing St. Isidore to operate a virtual charter school, the State would not be establishing, aiding, or favoring any particular religious organization. To the contrary: Excluding private entities from contracting for functions, based solely on religious affiliation, would violate the Free Exercise Clause of the First Amendment to the United States Constitution.

A. Allowing religious organizations to contract with the State to provide educational services violates neither the "no aid" provision of the Oklahoma Constitution, nor the Establishment Clause of the First Amendment.

¶2 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof... ." U.S.Const. Amend. I. Article 2, Section 5 of the Oklahoma Constitution, commonly referred to as the "no aid" provision, see Oliver v. Hofmeister, 368 P.3d 1270, 2016 OK 15, ¶ 3, bars public assets from being "appropriated, applied, donated, or used, directly or indirectly," for the "use, benefit, or support of" any religious organization, institution, or position. The Majority erroneously concludes that allowing sectarian organizations to operate charter schools violates these provisions.

¶3 Petitioner concedes his argument is not based on the fact that St. Isidore would receive public funds. His argument is that St. Isidore would be an arm of the government, simply because it is designated as a "public school" in the Act. But the reasoning that he, and the Majority, use to support that argument is circular. It goes something like this: (1) the State constitutionally must provide non-sectarian public education to all children; (2) publicly funded schools are, by definition, arms of the State; (3) under the Charter Schools Act, charter schools are defined as "public schools"; therefore, (4) charter schools are state actors and, as such, must be non-sectarian.

¶4 This argument is flawed. The Oklahoma Constitution requires the State to create a system of public schools, "free from sectarian control" and available to all children in the State. Okla.Const. Art. 1, § 5. It does not bar the State from contracting for education services with sectarian organizations, so long as a state-funded, secular education remains available statewide. St. Isidore would not be replacing any secular school, only adding to the options available, which is the heart of the Charter Schools Act. Simply put, requiring the state to fund non-sectarian education is not the same as allowing some funds to flow to sectarian education programs.

¶5 What about the "no aid" command in Article 2, Section 5 of our Constitution? As this Court has held many times, the "no aid" clause is not violated by contracts for services. The State contracts with private entities all the time for the performance of countless functions, from building roads to renewing motor-vehicle license tags. In contexts very similar to this one -- involving public funds and religious organizations -- this Court has held that public-private contracts are not invalid simply because a religious entity might receive some tangential benefit. In Oliver, 2016 OK 15, we rejected a "no aid" challenge to a school-voucher scholarship program. In Burkhardt v. City of Enid, 1989 OK 45, 771 P.2d 608, we rejected a challenge to the use of public funds for a purchase and lease-back arrangement involving a sectarian university. And in Murrow Indian Orphans Home v. Childers, 1946 OK 187, 171 P.2d 600, we approved the use of public funds to contract with the Baptist Church to operate an orphanage. The guiding principle in these cases is this: "[A]s long as the services being provided 'involve the element of substantial return to the state and do not amount to a gift, donation, or appropriation to the institution having no relevancy to the affairs of the state, there is no constitutional provision offended.'" Oliver, 2016 OK 15, ¶ 19 (quoting Morrow, 1946 OK 187 at ¶ 9).[1] In short, contracts for services -- including educational services -- do not violate the "no aid" provision of our Constitution.

¶6 For the same reasons, St. Isidore's operation of a charter school would not violate the Establishment Clause. There is no Establishment Clause issue if the action in question is not "state action." Petitioner's argument -- and the Majority's analysis -- depend on labeling all charter schools as "public schools," which is equivalent to "state actors." Again, this places form over substance.

¶7 A private entity, such as a religious organization, may be deemed a state actor if it performs a function traditionally considered the exclusive realm of the state. Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352 (1974). But the Majority concedes that education is not a "traditionally exclusive public function." Majority at ¶ 30. It may be the State's prerogative to create a new, hybrid class of educational institutions called "charter schools," but that is not the same as claiming that education itself has traditionally been the exclusive prerogative of the State.[2]

¶8 Nor can charter schools be considered state actors simply because the State regulates them. It hardly needs to be said that regulation alone does not transform a private entity into a public one. Jackson, id. at 350. Even an "extensive and detailed" regulatory scheme does not automatically transform an entity into a state actor. Id. The Charter Schools Act can place relevant requirements on prospective charter-school operators without thereby turning them into arms of the state. Ironically, one of the aims of the Act is to place fewer regulations on charter schools compared to traditional schools.[3] It is undisputed that, aside from its religious affiliation, St. Isidore meets the requirements for operating a charter school.

¶9 Petitioner claims the Legislature made the analysis "easy" by labeling charter schools as public schools. 70 O.S. § 3-132(D). To the contrary, the analysis is easy because the realities belie such labeling. Regardless of how the State chooses to label charter schools, the Charter Schools Act is clearly an invitation for private entities to contract to provide educational choices. "[T]he definition of a particular program can always be manipulated to subsume the challenged condition," and allowing the State to "recast" a condition on funding in this manner would result in "the First Amendment ... reduced to a simple semantic exercise." Carson v. Makin, 142 S.Ct. 1987, 1999 (2022) (citations omitted). A similar instance of semantic legerdemain was attempted in Espinoza v. Montana Dept. of Revenue, 591 U.S. 464, 487 (2020), discussed below.

¶10 Contracting to provide educational alternatives is not the same as a wholesale outsourcing of a government function.[4] The virtual charter school St. Isidore seeks to undertake would simply be a choice for students and parents. It would not be the only virtual charter school. It would not be the only charter school. But most important, it would not supplant any state-mandated sectarian public school.

¶11 By choice, the State created a new type of educational entity -- the charter school. By design, the very purpose of the Charter Schools Act is to allow private entities to experiment with innovative curricula and teaching methods, and to give students and parents "additional academic choices." 70 O.S. § 3-131(A). The State is not required to partner with private entities to provide common education. But if it does, it cannot close the door to an otherwise qualified entity simply because it is sectarian. Espinoza, 591 U.S. at 487; see also Everson v. Board of Ed. of Ewing, 330 U.S. 1, 16 (1947) (a State cannot exclude individuals "because of their faith, or lack of it, from receiving the benefits of public welfare legislation"). Contracting with private entities to provide such educational choices does not violate Article 2, § 5 of the Oklahoma Constitution.

B. Insofar as it denies religious organizations the chance to operate charter schools, the Charter Schools Act violates the Free Exercise Cla use of the First Amendment.

¶12 The latter part of the First Amendment, known as the "Free Exercise Clause," protects those who practice religion from laws that "impose special disabilities on the basis of ... religious status." Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S.Ct. 2012, 2021 (2017). Specifically, laws that disqualify otherwise eligible recipients from a public benefit, based solely on their religious character, impose "a penalty on the free exercise of religion that triggers the most exacting scrutiny." Id. To pass constitutional muster under the so-called "strict scrutiny" test, the State must advance a compelling interest that justifies the action in question. The State's interests must be of the "highest order," and the means used must be narrowly tailored in pursuit of those interests. Trinity, id. at 2024.

¶13 Espinoza v. Montana Dept. of Revenue, decided quite recently, involved a very similar tension between the Free Exercise Clause and a "no aid" provision in the Montana Constitution. The issue in Espinoza was whether students who received a state-funded scholarship to be used at private schools could use those funds at sectarian schools. Shortly after creation of the scholarship program, the Montana Department of Revenue promulgated a rule that, for purposes of the program, purported to redefine "qualified education provider" to exclude sectarian schools. The Department explained that the rule was necessary to reconcile the scholarship program with the "no aid" provision of the state's constitution. Espinoza, 591 U.S. at 467-470.

¶14 When parents sued for the right to apply scholarship funds to attend a sectarian school, the Montana Supreme Court approved of the exclusion as consistent with the state constitutional command to give "no aid" to sectarian schools via public funds. The United States Supreme Court reversed. The question presented was "whether the Free Exercise Clause precluded the Montana Supreme Court from applying Montana's no-aid provision to bar religious schools from the scholarship program." 591 U.S. at 474. Because the scholarship program discriminated on the basis of religion, it was subjected to the strictest scrutiny. Id. at 484. The Court found unconvincing the Department of Revenue's claim that such an interpretation of the "no aid" provision actually promoted religious liberty. And as for the argument that diverting public funds to sectarian schools served to rob public schools of funds, the Court simply noted that any such effect was a direct consequence of the scholarship program as a whole -- not to the fact that sectarian schools could take part. Id. at 485-86.

¶15 Similarly, the only compelling interest advanced by Petitioner in the instant case, to justify barring a religious organization from operating a charter school, is the "no aid" provision in our own Constitution. But as demonstrated above -- under the long-standing line of authority from Murrow, to Burkhardt, to Oliver -- that provision is not violated here. Contracting with a private entity that has religious affiliations, by itself, does not establish a State religion, nor does it favor one religion over another. Allowing St. Isidore to operate a charter school does not give it any preference over any other qualified entity, sectarian or otherwise.

¶16 I find nothing in the State or Federal Constitutions barring sectarian organizations, such as St. Isidore, from applying to operate charter schools. To the extent Section 3-136(A)(2) of the Charter Schools Act bars such organizations from even applying to operate a charter school, I would find it inconsistent with the Free Exercise Clause of the First Amendment.[5] By reaching the opposite conclusion, the Majority's decision is destined for the same fate as the Montana Supreme Court's opinion in Espinoza.

FOOTNOTES

[1] Even if Petitioner did focus on the fact that State funds would go directly to St. Isidore, that argument would be meritless. The funds are not a donation, but compensation for services rendered. Whether payment goes to the student/parent, or the school directly, is of no practical difference under this scheme; if a student does not enroll, the school does not receive funds related to that additional student.

[2] Instead, the Majority tries to reframe the relevant 'function' as something like, 'a state-wide system of publicly-funded education,' which of course by definition is a state function.

[3] Charter schools are exempt from statutes and rules relating to schools, boards of education, and school districts. 70 O.S. § 3-136(A)(5). They are not required to hire teachers with state teaching certificates. https://sde.ok.gov/faqs/oklahoma-charter-schools-program.

[4] Petitioner's brief ends with an analogy that demonstrates the flaw in his argument:

[I]f the State decided to allocate public funds for private entities to beef up security, the State would of course be precluded from preventing the Catholic Church and other sectarian organizations from receiving those funds. However, if the State decided to start authorizing private entities to take over operations of the Oklahoma Highway Patrol, it would violate the Establishment Clause for the State to authorize a "Catholic Church Highway Patrol."

The logical flaw is that, unlike law enforcement, enrollment in a charter school is fundamentally a choice for parents to make. St. Isidore would not be "taking over" any function that is traditionally the exclusive realm of the State. It would exist alongside state-mandated secular options.

[5] The Act's requirement that charter schools be nonsectarian (70 O.S. § 3-136(A)(2)) also violates the Oklahoma Religious Freedom Act (OFRA), which mandates that the State shall not "substantially burden a person's free exercise of religion" -- even if the law or rule in question is one of general applicability. 51 O.S. § 253(A). As amended in November 2023, this statute specifies that the State may not exclude any entity from participating in a government program "based solely on [its] religious character or affiliation." 51 O.S. § 253(D). Aside from the fact that the Act's "nonsectarian" requirement violates the Free Exercise Clause, it is also a dead letter under Oklahoma law, as the ORFA is the more recent expression of legislative intent. City of Sand Springs v. Dep't. of Pub. Welfare, 1980 OK 36, ¶ 28, 608 P.2d 1139, 1151.

 

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1989 OK 45, 771 P.2d 608, 60 OBJ 785, 
Burkhardt v. City of Enid
Discussed

 
1941 OK 397, 122 P.2d 1002, 190 Okla. 254, 
GURNEY v. FERGUSON
Discussed at Length

 
1993 OK 37, 850 P.2d 1069, 64 OBJ 978, 
Ethics Com'n of State of Okl. v. Cullison
Discussed

 
1946 OK 187, 171 P.2d 600, 197 Okla. 249, 
MURROW INDIAN ORPHANS HOME v. CHILDERS
Discussed at Length

 
1929 OK 116, 278 P. 311, 137 Okla. 95, 
SHAW v. GRUMBINE
Discussed

 
2013 OK 84, 313 P.3d 891, 
SCOTT v. OKLAHOMA SECONDARY SCHOOL ACTIVITIES ASSOCIATION
Discussed

 
1980 OK 36, 608 P.2d 1139, 
City of Sand Springs v. Department of Public Welfare
Discussed at Length

 
2015 OK 54, 373 P.3d 1032, 
PRESCOTT v. OKLAHOMA CAPITOL PRESERVATION COMMISSION
Discussed at Length

 
2016 OK 15, 368 P.3d 1270, 
OLIVER v. HOFMEISTER
Discussed at Length

 
2020 OK 56, 473 P.3d 475, 
INDEPENDENT SCHOOL DISTRICT # 52 v. HOFMEISTER
Discussed

Title 51. Officers

 
Cite
Name
Level

 
51 O.S. 251, 
Short Title
Cited

 
51 O.S. 253, 
Government Burden on Religious Freedom
Discussed at Length

Title 70. Schools

 
Cite
Name
Level

 
70 O.S. 3-130, 
Short Title
Cited

 
70 O.S. 3-131, 
Purpose
Discussed

 
70 O.S. 3-132, 
Application of Oklahoma Charter Schools Act
Discussed at Length

 
70 O.S. 3-136, 
Charter School Compliance - Contract - Charter
Discussed at Length

 
70 O.S. 1-106, 
Public Schools - Definition - What Included
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA